United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CSNK WORKING CAPITAL FINANCE CORP., <br><br> Plaintiff, <br><br> v. <br><br> NEXT CREATION HOLDINGS, <br><br> Defendant. | Case No.17-cv-00305-HRL <br><br> **ORDER RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. No. 38 |

Plaintiff CSNK Working Capital Finance Corp., d/b/a Bay View Funding (Bay View) moves for summary judgment or, in the alternative, for partial summary judgment on specific facts. Dkt. No. 38. Defendant Next Creation Holdings, LLC (Next) opposes the motion. Dkt. No. 42. For the reasons described below, the Court grants the motion in part and denies it in part.

Both parties consented to magistrate judge jurisdiction. Dkt. Nos. 8, 13.

## I.  BACKGROUND

Bay View executed a factoring agreement with a non-party, Shell Home Fashions LLC (Shell), acquiring the rights to some of Shell's accounts receivable. Dkt. Nos. 1, Ex. A; 38-2, Shu Decl. ¶¶ 2-3. Bay View recorded its interest in Shell's assets with the New York State Secretary of State. Dkt. Nos. 1, Ex. B; 38-2, Shu Decl. ¶¶ 2-3. Separately, Shell and Next entered into an agreement for the sale of bedsheets. Dkt. No. 42-1, Bhatt Decl. ¶¶ 2-3. Under the agreement, the bedsheets were to be shipped from Shell's factory in India to the Port of Houston, and then transported to Next's warehouse in Dallas. *Id.* Meanwhile, Next contracted to resell the bedsheets it purchased from Shell to Macy's, Inc. (Macy's).

Next claims that it took delivery of the sheets from Shell on August 30, 2016. *Id.* ¶ 5. Under a deadline to deliver the sheets to Macy's, Next then shipped the sheets to Macy's

department stores across the country on September 7. Dkt. Nos. 42-1, Bhatt Decl. ¶ 7; 42-4, Ex. C.. Rohan Bhatt, Next's product manager, avers that Next would normally conduct random inspections of goods before resale, but that the need to quickly deliver the sheets to Macy's precluded such quality control measures. Dkt. No. 42-1, Bhatt Decl. ¶¶ 6-7. Between September and early October, Shell and Next exchanged e-mails concerning Next's expected payment on the bedsheet invoice. Dkt. Nos. 38-2, Shu Decl. ¶ 9; 38-3, Exs. H, I.

At some point in late September, however, Macy's informed Next that customers were returning the sheets, complaining that they were too small. Dkt. No. 42-1, Bhatt Decl. ¶ 8. Next informed Shell and Bay View of the problem. In mid-November, Shell agreed to a $32,379 markdown on the amount owed to it by Next for the bedsheets. *Id.* ¶ 10

Macy's later discovered that the sheets were not only too small, but that they contained uneven and crooked stitching. *Id.* ¶ 11. By this point, Next feared it might lose future business with Macy's because of the defective sheets. Dkt. No. 42-7, Ex. F ("We are facing [a] major issue with our customer."). Next informed Shell of the stitching problem. Bhatt e-mailed Shell's president, Sandeep Jain, and wrote:

> "It seems we have another issue from Bloomies[1] . . . Our buyer is taking a very hard stand against us for these sheets, they want to return all these sheets to us or are asking a huge (further) discount, apart from 'pausing/not doing business in near future with our company[.]'
>
> This is a heads up, I am afraid this will affect our plan to send you money next week (after deducting the original debit note)[.]"

Dkt. No. 42-6, Ex. E.

At some point, Bay View learned of the stitching defect, but the parties disagree as to what happened next. Bay View alleges that it tried to arrange for the return of the bedsheets to Bay View or Shell for resale to a second-tier liquidator. Bay View's attorney, Catherine Robertson, avers that between November and December, she and representatives from Next discussed the possibility that Bay View/Shell would retake possession of the sheets. Dkt. Nos. 38 at 4; 38-6, Robertson Decl. ¶ 5. Next, meanwhile, claims that it tried to arrange for Macy's to return the

---

[1] Macy's and Bloomingdale's are part of the same company.

2

goods to Shell. On December 2, Bhatt (Next) e-mailed Jain (Shell) and others, writing: "Kindly confirm if you want us to ask for RTV [return to vendor], if yes, we will and will get you the details from where to pick up the goods." Dkt. Nos. 42-1, Bhatt Decl. ¶¶ 12-13; 42-7, Ex. F. According to Bhatt, Shell never replied to this e-mail, and never contacted him to arrange for the return of the goods. Dkt. No. 42-1, Bhatt Decl. ¶ 13.

At the same time, Next was trying to salvage its relationship with Macy's. On November 22, Clyde Collier, Next's executive vice president of sales and marketing, wrote an apologetic e-mail to Stephanie Schwarz, an employee at Macy's. Schwartz replied: "I cannot sell product like this. Would you like to support us marking it down or would you like us to [return to vendor]?" Dkt. No. 42-9, Ex. 1[2]. Collier replied the same day: "I can support a markdown on the product Stephanie, can you provide me with the number you are talking about? My apologies for the issue." *Id.* Collier and Schwartz exchanged a few more e-mails to clarify the terms of the markdown, and on December 15, Collier wrote: "Stephanie, I understand the situation and very much apologize for the quality issue, please process a chargeback[.]" *Id.* Collier later reported to his colleagues at Next that he agreed to forgo payment on the entire bedsheet order. He avers that, in the hope of repairing Next's relationship with Macy's, he felt like he "had no choice but to support the chargeback[.]" Dkt. No. 42-8, Collier Decl. ¶ 3.

John Walker, Next's chief financial officer, avers that he learned about the chargeback on December 15, right after Collier reached his agreement with Schwartz. Dkt. 42-10, Walker Decl. ¶ 2. Like Collier, Walker contends that Macy's refused to return the bedsheets to Next, and that a chargeback was Next's only option. *Id.* ¶¶ 2-3. Walker emphasizes that Next lost expected profits on the deal, and that the company did not earn any money on the sheets that were left with Macy's. *Id.* ¶ 3.

Walker informed Catherine Robertson, Bay View's attorney, of Next's decision to accept the chargeback from Macy's the same day. Dkt. Nos. 38-7, Ex. K, 42-10, Walker Decl. ¶ 2. Robertson claims she was blindsided by the news. According to Robertson, she and Bay View

---

[2] Collier separately avers that Schwartz was not willing to pull the sheets from store shelves and return them to Shell. Dkt. No. 42-8, Collier Decl. ¶ 3.

3

1  still believed there was a chance that Bay View or Shell might retake possession of the sheets for
2  resale. Dkt. No. 44-3, Robertson Decl. ¶¶ 3-4.

Bay View sued Next. Dkt. No. 1. Separately, Next sued Shell in Texas state court. Dkt. No. 35 at 2. Next moved to stay the proceedings in this Court pending resolution of the Texas litigation, but the Court denied Next's request. *Id.* at 4.

Bay View timely moved for summary judgment or, in the alternative, for partial summary judgment on specific facts. Next filed an opposition. Dkt. No. 42. In addition to opposing Bay View's summary judgment motion, Next argued that the Court lacked subject matter jurisdiction because the amount in controversy was less than $75,000. Dkt. No. 42 at 5-6. Next separately filed a motion to dismiss on that basis, but the Court denied the motion. Dkt. No. 48. The Court heard oral arguments on the summary judgment motion on December 12, 2017.

## II.  LEGAL STANDARD

The court should grant a motion for summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the moving party bears the initial burden of producing evidence demonstrating the absence of a triable issue of material fact; or, if the nonmoving party would bear the burden of proof on an issue at trial, the moving party need only show an absence of evidence in support of a claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). If the moving party meets this burden, the burden shifts to the non-moving party to demonstrate a genuine issue of material fact. *Id.* at 324. A "genuine issue" of material fact exists if the nonmoving party's evidence, viewed in the light most favorable, "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

## III.  DISCUSSION

### A.  Claims Under Consideration

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a). Bay View's complaint asserts five claims against Next: (1) "Breach of Obligation to Pay Invoice"; (2) "Promise Without Intent to Perform; (3) conversion; (4) violation of California's Unfair

4

Competition Law, Cal. Bus. & Prof. Code § 17200; and (5) promissory estoppel. Dkt. No. 1. Bay View's notice of motion states that it is moving for summary judgment "as to any claim alleged in the Complaint." Dkt. No. 38-1 at 2:4-5. However, the accompanying memorandum of points and authorities does not offer any further specificity as to the claim or claims on which Bay View seeks summary judgment. Except for Next's arguments concerning subject matter jurisdiction, the briefing by both parties deals exclusively with contract law.

Of Bay View's five claims, the first, "Breach of Obligation to Pay Invoice," fits most closely with the arguments presented by the parties. *See* Dkt. No. 1 ¶¶ 23-24 ("[Next] breached the oral agreements between [Shell] and [Next] . . . As a result of [Next's] breach of contract, [Bay View] has suffered damages . . . .").

In light of Bay View's failure to clearly "identify[ ] each claim . . . on which summary judgment is sought," and the parties' apparent assumption that the motion concerns Next's alleged breach of contract, the Court will construe the motion as one for summary judgment on Bay View's first claim. Summary judgment is denied as to the four other claims in Bay View's complaint. The remainder of this order will address whether Bay View is entitled to summary judgment on its claim for "Breach of Obligation to Pay Invoice."

### B. Choice of Law

The parties disagree as to whether the laws of California or Texas govern the Shell-Next contract. Bay View argues that California law should apply. Next argues that the Court should apply Texas law. Next notes, and Bay View does not disagree, that the Shell-Next invoice did not contain a choice of law provision. Next argues that Texas law should therefore control because the agreement was made in Texas, and because the bedsheets were first shipped from India to Next in Houston. Dkt. No. 42 at 6. Next acknowledges, however, that California and Texas law are indistinguishable as it concerns questions of acceptance, rejection, and revocation. The only difference Next identifies between the two states' laws concerns damages. Bay View argues that, should it win a judgment, the Court should apply California's 10% statutory prejudgment interest provision. Next argues that Texas' smaller, 5% prejudgment interest provision applies.

A federal district court exercising diversity jurisdiction generally applies the choice-of-law

rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). California courts generally apply California substantive law to contract disputes where there is no advance agreement as to the governing law. If, however, a party seeks the application of another state's law, that party must demonstrate that the alternative state's law is appropriate under the three-step "governmental interests analysis." *Wash. Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 919 (2001).[3] Under the governmental interests test, the foreign law proponent must establish: (1) that the foreign law materially differs from California law; (2) the interests of each state in applying their own law to the dispute; and (3), if there is a true conflict, which state's interest stands to be most impaired if its law is not applied. *Id.* at 919-20. "[I]f the relevant laws of each state are identical, there is no problem and the trial court may find California law applicable[.]" *Id.* at 920.

Here, Next acknowledges that, with the exception of prejudgment interest, the relevant California and Texas laws are identical. In the absence of any conflict, California law applies. *See Wash. Mut.*, 24 Cal. 4th at 920. As to prejudgment interest, the Court need not reach the question because, as is discussed below, the Court declines to reach the ultimate questions of liability and damages.

### C. Next Accepted the Goods from Shell

Bay View argues that the Court should grant summary judgment because Next accepted the bedsheets from Shell. Bay View argues that Next accepted the goods when Next "gave [the bedsheets] away" to Macy's. Dkt. No. 42 at 12. Bay View argues that by agreeing to a chargeback from Macy's, and by failing to facilitate the return of the sheets to Bay View/Shell, Next acted in a way that amounted to acceptance as a matter of law. Next contends that it either affirmatively rejected Shell's tender, or revoked acceptance after discovery of the defects. Next

---

[3] California courts apply the choice-of-law rules found in California Civil Code § 1646 to questions of contract interpretation, and the governmental interests test to questions other than interpretation, such as acceptance, rejection, and revocation. *See Fireman's Fund Ins. Co. v. Nationwide Mut. Fire Ins. Co.*, No. 11CV114-IEG-DHB, 2012 WL 1985316, at *5 (S.D. Cal. June 4, 2012); *cf. Royal Indem. Grp. v. Travelers Indem. Co. of R.I.*, No. C-04-00886 RMW, *2005 WL 2176896*, at *5 (N.D. Cal. Sept. 6, 2005) (applying § 1646 to interpretation dispute, while noting that governmental interests analysis applies outside the context of contract interpretation).

6

argues that genuine disputes exist as to whether Next had a reasonable opportunity to inspect the sheets before accepting them, and whether the defects were reasonably discoverable. Next also points out that it tried to arrange for a return of the sheets from Macy's to Shell, but that Shell allegedly never responded. Finally, Next emphasizes that it believed it had no choice but to agree to the chargeback from Macy's, and that it gained nothing from the transaction except a damaged relationship with one of its customers.

If a seller's tender of goods fails in any respect to conform to the contract, the buyer may reject the whole, accept the whole, or accept some of the goods and reject the rest. Cal. Com. Code § 2601. A buyer who accepts goods without knowing that the goods do not conform to the contract may revoke his acceptance if his acceptance was reasonably induced by the difficulty of discovery of the nonconformity. *Id.* § 2608(1)(b). Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the nonconformity, and the revocation is not effective until the buyer notifies the seller. *Id.* § 2608(2). Subject to exceptions not relevant here, once a buyer rejects all or part of a tender, the buyer "is under a duty after rejection to hold [the goods] with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them[.]" *Id.* § 2602(2)(b). A buyer who revokes acceptance has the same rights and duties as a buyer who rejects a seller's tender before acceptance. *Id.* § 2608.

Under California Commercial Code § 2606, which is based on Uniform Commercial Code ("UCC") § 2-606, acceptance occurs when the buyer:

> "(a) After a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or
> (b) Fails to make an effective rejection . . . but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
> (c) Does any act inconsistent with the seller's ownership . . . ."

Cal. Com. Code § 2606. Upon acceptance, the buyer must pay for the goods at the contract rate, and the buyer is generally precluded from rejecting the goods. *Id.* §§ 2607(1),(2). Further, the burden shifts to the buyer to establish any breach with respect to the goods accepted. *Id.* § 2607(3).

As Next points out, whether a buyer had a reasonable opportunity to inspect goods before

accepting them, or whether defects were reasonably discoverable, are questions of fact. *See Purnell v. Guar. Bank*, 624 S.W.2d 357, 359 (Tex. App. 1981) (interpreting identical Texas statutes). Further, courts applying the "acts inconsistent with the seller's ownership" provision have often been forbearing towards buyers who resold goods to third parties. Some courts, interpreting identical statutes in other states, have concluded that a buyer's resale of goods was not inconsistent with the original seller's ownership where the buyer (1) was not aware that the goods were defective at the time of resale, and (2) did not have a reasonable opportunity to inspect the goods before resale. *See In re H.P. Tool Mfg. Corp.*, 37 B.R. 885, 888 (Bankr. E.D. Pa. 1984) (buyer revoked acceptance after re-sale, where buyer was reasonably unaware that goods were defective at time of resale; was reasonable for buyer not to inspect the goods before resale where defects were difficult to discover and buyer was under deadline to deliver goods to customers); *Jacob Hartz Seed Co. v. Coleman*, 271 Ark. 756, 759 (1981) ("[A]cts done without knowledge of defects, which the buyer could not have discovered, do not fall under [UCC 2-606(1)(c)]. Thus, appellee's argument that the resale by appellant, the buyer, constituted an inconsistent act which establishes acceptance is not persuasive."); 1 White, *et al.*, *Uniform Commercial Code* § 9:5 (6th ed. 2012) (White)

However, if a buyer resells goods after learning of a defect, courts and commentators tend to treat the resale as inconsistent with the seller's ownership. *See China Nat'l Metal Products . Imp./Exp. Co. v. Apex Digital, Inc.*, 141 F. Supp. 2d 1013, 1025-26 (C.D. Cal. May 1, 2001), *order set aside on other grounds*, 155 F. Supp. 2d 1174 (C.D. Cal. June 13, 2001) (buyer's resale of goods after learning of defects constitutes acceptance); *Contract Sales & Serv. Int'l, Inc. v. Am. Exp. Travel Related Servs. Co.*, 216 Ga. App. 61, 61, 453 S.E.2d 62, 63 (1994) (resale of allegedly defective goods was inconsistent with seller's ownership, and therefore acceptance); *Ford v. Starr Fireworks, Inc*., 874 P.2d 230, 235 (Wyo. 1994) (resale of goods after discovery of defects inconsistent with rejection); White §§ 9:5, 9:18. According to the drafters of the UCC, "[A]ny action taken by the buyer, which is inconsistent with his claim that he has rejected the goods, constitutes acceptance." White § 9:5.

Here, the Court agrees with Next that Bay View has not met its burden of proving that no

8

genuine dispute of material fact exists as to whether Next accepted the bedsheets before agreeing to the chargeback with Macy's. The Court is not convinced that, as a matter of law, Next had a reasonable opportunity to inspect the sheets for defects between receiving them in late August and shipping them to Macy's stores on September 7. Similarly, the Court is not satisfied that, even if Next initially accepted the bedsheets, it did not at least attempt to revoke that acceptance within a reasonable time after learning of the defects. *See* Dkt. No. 42-6, Ex. E. ("Our buyer is taking a very hard stand against us for these sheets . . . I am afraid this will affect our plan to send you money next week[.]"). Additionally, Next convincingly argues that these defects might have been difficult to discover, especially because Next had a long, successful course of dealing with Shell's Indian factory prior to this transaction. All of these issues would be more appropriate for resolution by a jury than summary judgment by the Court.

The Court is convinced, however, that Next accepted Shell's tender when Next agreed to leave the sheets with Macy's. The Court notes that the parties disagree as to when Next made this agreement. Bay View claims it was on November 22, when Collier declined Schwartz's offer to retake possession of the sheets and instead offered a markdown. Next, with some justification based on the extended e-mail chain between Collier and Schwartz, suggests that the chargeback from Macy's did not occur until December 15. In either case, however, the result was the same: Macy's kept the sheets, and Bay View and Shell were left with nothing.

The Court is hard-pressed to characterize Next's decision to leave the sheets with Macy's as anything other than inconsistent with the seller's ownership. If Next had, hypothetically, kept the bedsheets at its warehouse for a few additional weeks, and then resold the sheets to Macy's after learning of the defects, there would be no doubt that the resale amounted to acceptance. Here, even if the Court accepts that Next at some point rejected or revoked acceptance of Shell's tender, Next would have been under a duty to make the sheets available for Bay View/Shell to retrieve them. *See* Cal. Com. Code § 2602(2)(b). Instead, Next agreed to accept the chargeback from Macy's, which cut off any chance Bay View/Shell had at retaking possession of the goods. Abandoning the sheets at Macy's was inconsistent with rejection or revocation, and therefore amounts to acceptance as a matter of law.

9

1    The Court rejects Next's argument that the company's post-rejection use of the bedsheets
2    was not acceptance. As Next correctly points out, a buyer may sometimes continue to use rejected
3    goods without that use maturing into acceptance. In *Liarikos v. Mello*, 639 N.E.2d 716 (Mass.
4    1994), for instance, the court determined that a buyer's continued use of a defective car might not
5    bar rejection where the buyer depended on the vehicle for her business. *See also Deere & Co. v.
6    Johnson*, 271 F.3d 613, 620 (5th Cir. 2001) (reaching a similar conclusion); *Turner Envirologic,
7    Inc. v. Griffin Indus., Inc.*, No. 2007-CA-001967-MR, 2009 WL 484986 (Ky. Ct. App. Feb. 27,
8    2009) (buyer's continued use of defective air pollution control equipment did not bar revocation
9    where equipment was necessary for continued operation of buyer's factory).

Here, Next faced a very different kind of dilemma. The business owners in *Liarikos* and *Turner Envirologic* argued that their enterprises would grind to a halt without access to some particular piece of machinery. Next's problem was no less serious, but Next did not need the sheets themselves; if it did, the company presumably would not have abandoned them at Macy's. Next was constrained not by its need for the goods, but by its relationship with an important client. The cases cited by Next do not fit this case because what Next did with the sheets cannot be fairly characterized as "continued use." Next did not continue to *use* the bedsheets. Next resold the sheets to Macy's and, after the defects were discovered, adjusted the resale price down to zero. Next may have had good reasons for doing so, but the company's reliance on cases involving continued post-rejection use of goods is not persuasive.

Further, Next's argument that it could not have accepted the sheets because it did not benefit from the transaction is without merit. The California Commercial Code provides that even an unhappy buyer might accept a seller's tender by failing to timely reject, or by taking an action inconsistent with the seller's ownership. Cal. Com. Code § 2606. That is exactly what happened here. Additionally, as Bay View points out, Next arguably did benefit, at least in the sense that agreeing to the chargeback helped mitigate the damage done to Next's relationship with Macy's.

Finally, Next's argument that it had no choice to accept Macy's demand for a chargeback is not convincing. The November 22nd e-mail between Schwartz (Macy's) and Colliers (Next) suggests that, at least at some point, Macy's did offer Next a choice between a chargeback and a

return of the goods. Dkt. No. 42-9, Ex. 1. That, however, is beside the point. Even if Macy's was never going to accept a return of the goods, Next's efforts to salvage its business relationship with Macy's have no bearing on Next's contractual obligations to Bay View/Shell. Next may have valid defenses or counterclaims to Bay View's suit, but Macy's insistence on a chargeback is not one of them.

That Next may still have defenses or counterclaims speaks to the limits of the Court's order on this motion. The Court is not concluding that Next is liable to Bay View on the Shell-Next contract. Nor is the Court reaching the question of whether, assuming Next is liable on the contract, Next is entitled to any offsets or credits due to the defects in the bedsheets.[4] The Court is concluding only that, in the context of the contract between Shell and Next, Next accepted the bedsheets, within the meaning of Cal. Com. Code § 2602, when Next agreed to leave the sheets with Macy's. *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment . . . [on] the *part of each claim. . . .*") (emphasis added). In all other respects, the Court denies the motion.

**IT IS SO ORDERED.**

Dated: January 3, 2018

HOWARD R. LLOYD
United States Magistrate Judge

---

[4] Because the Court is not reaching the ultimate question of liability, the Court declines to address Next's argument that summary judgment is not warranted because Bay View has not addressed Next's entitlement to offsets or credits.

11